UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Defendant. | Case No. 14-cr-00175-TEH<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE AN OFFENSE: COUNTS 2-28** |

This matter came before the Court on October 19, 2015 for a hearing on Defendant Pacific Gas & Electric ("PG&E")'s Motion to Dismiss for Failure to State an Offense: Counts 2-28. After carefully considering the parties' written and oral arguments, the Court now DENIES PG&E's motion, for the reasons set forth below.

**BACKGROUND**

On September 9, 2010, a gas line owned and operated by PG&E ruptured, causing a fire that killed 8 people and injured 58 others. Superseding Indictment ("SI") ¶ 5 (Docket No. 22). The fire damaged 108 homes, 38 of which were completely destroyed. *Id.* On July 30, 2014, a grand jury returned a superseding indictment ("Indictment") charging PG&E with 27 counts of violating the minimum federal safety standards for the transportation of natural gas by pipeline ("Pipeline Safety Act"), as set forth in 49 C.F.R. § 192 ("Section 192"). SI ¶¶ 62-75. "Knowing and willful" violations of these standards are criminalized under 49 U.S.C. § 60123 ("Section 60123").

**LEGAL STANDARD**

Under Rule 12(b) of the Federal Rules of Criminal Procedure, a defendant may "raise by pretrial motion any defense, objection, or request that the court can determine

United States District Court<br>Northern District of California

without a trial on the merits," including a motion to dismiss an indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(1), 12(b)(3)(B)(v).

An indictment must contain "the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated," and "a plain, concise, and definite written statement of the essential facts constituting the offense." Fed. R. Crim. P. 7(c)(1).

**DISCUSSION**

PG&E now moves to dismiss all 27 Pipeline Safety Act counts of the Indictment for failure to state an offense. In this particular motion, PG&E does not challenge the sufficiency of the facts or legal theories underpinning these counts. Rather, PG&E argues that the Indictment should be dismissed because the alleged conduct does not state a federal offense where, as here, the federal government has no direct regulatory power.

**I.    The State Certification Scheme**

Through 49 U.S.C. § 60105 ("Section 60105"), Congress granted all states the option to assume exclusive responsibility for regulating intrastate pipelines, in lieu of federal regulation under the Pipeline Safety Act. Under Section 60105, states can obtain exclusive regulatory and enforcement authority by certifying to the Secretary of Transportation that they have adopted their own safety standards. Specifically, Section 60105(a) provides:

> Except as provided in this section and sections 60114 and 60121 of this title, the Secretary of Transportation may not prescribe or enforce safety standards and practices for an intrastate pipeline facility or intrastate pipeline transportation to the extent that the safety standards and practices are regulated by a State authority . . . that submits to the Secretary annually a certification for the facilities and transportation that complies with subsections (b) and (c) of this section.

Subsections (b) and (c) go on to detail the certification process and requirements.

Of particular relevance are subsections (b)(2) and (b)(7). Section (b)(2) requires each participating state to certify that it "has adopted . . . each applicable standard

United States District Court
Northern District of California

2

prescribed under this chapter."  As confirmed elsewhere in the Pipeline Safety Act,[1] subsection (b)(2) mandates that state regulations be at least as stringent as the federal regulations, but allows that they may be more stringent.  With respect to enforcement, subsection (b)(7) requires each participating state to certify that it "may enforce safety standards of the authority under a law of the State by injunctive relief and civil penalties substantially the same as provided under sections 60120 and 60122(a)(1) and (b)-(f) of this title."  Section 60105 is silent as to criminal penalties.

The parties agree that California is a certified state, and that the Secretary of Transportation therefore cannot prescribe regulations or otherwise enforce Section 192 as against intrastate pipelines in California.  Def.'s Mot. to Dismiss Counts 2-28 ("Mot.") at 6-7 (Docket No. 123); Opp'n to Def.'s Mot. to Dismiss Counts 2-28 ("Opp'n") at 2 (Docket No. 143).

## II.    Summary of Parties' Arguments

The parties disagree about whether Section 60105 likewise limits the Attorney General's authority to prosecute intrastate pipelines in California for violations of Section 192, pursuant to Section 60123.  PG&E argues that because Section 60123 criminalizes only violations of *federal* regulations, which PG&E cannot violate by virtue of not being subject to federal regulation, "there can be no federal criminal violations of those regulations," and all 27 regulatory counts should be dismissed for failure to state a federal crime.  Reply in Supp. of Def.'s Mot. to Dismiss Counts 2-28 ("Reply") at 8 (Docket No. 176); Mot. at 7-8.  To support these arguments, PG&E relies heavily on a Ninth Circuit case that recently noted "the federalism structure of the Pipeline Safety Act favors state assumption of jurisdiction." *City & Cty. of S.F. v. U.S. Dep't of Transp.*, 796 F.3d 993, 1002 (9th Cir. 2015).

The Government argues that Section 60105 plainly limits only the Secretary of

_____

[1]  49 U.S.C. § 60104(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

Transportation's enforcement authority, leaving untouched the Attorney General's power to prosecute under Section 60123.  Opp'n at 3-7.

### III.     The Boundaries of Section 60105

PG&E's motion turns on an interpretation of Section 60105.  The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  Plainness "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Id.* at 341.  If "the statutory language is unambiguous and 'the statutory scheme is coherent and consistent,' " then the inquiry is complete.  *Id.* at 340. Only if any ambiguity remains should the Court look to the statute's legislative history for further clues as to its meaning.  *Blum v. Stenson*, 465 U.S. 886, 896 (1984).

### a.  The Plain Language of Section 60105 Limits Its Application to the Secretary of Transportation's Enforcement Powers, Leaving Untouched the Attorney General's Power to Prosecute Under Section 60123

The Ninth Circuit has made clear that "the doctrine of *expressio unius est exclusio alterius . . .* teaches that omissions are the equivalent of exclusions when a statute affirmatively designates certain persons, things, or manners of operation."  *ARC Ecology v. U.S. Dep't of the Air Force*, 411 F.3d 1092, 1099-1100 (9th Cir. 2005).

The Court need only consult eleven words to determine the scope of Section 60105: "the Secretary of Transportation may not prescribe or enforce safety standards."  Notable about these eleven words is what they do not say: there is no mention of the Attorney General, no limitation on prosecutorial power, and no reference to criminal penalties whatsoever.  Through these eleven words, Congress limited with clear and unmistakable clarity the enforcement powers of only one individual – the Secretary of Transportation. Accordingly, the meaning of Section 60105 is plain; it limits only the Secretary of

4

United States District Court
Northern District of California

Transportation's power to "prescribe or enforce safety standards," and has no bearing on the power of the Attorney General to prosecute crimes under Section 60123.

### b. The Structure of the Pipeline Safety Act Supports the Plain Language Reading of Section 60105

The structure of the Pipeline Safety Act supports this plain language reading. As discussed above, the Pipeline Safety Act mandates that any state regulatory scheme certified under Section 60105 be at least as stringent as the federal scheme:

> A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter.

49 U.S.C. § 60104(c). In other words, the Pipeline Safety Act creates a federal floor – contained in Section 192 – upon which certified states are free to expand, provided any expansion is consistent with Section 192. With respect to enforcement of this federal floor in certified states, Section 60105(b)(7) requires states to certify they have the *option* to enforce safety standards through state-level "injunctive relief and civil penalties in a manner substantially the same as provided under" the Pipeline Safety Act. But Section 60105 is silent as to state enforcement of the federal floor through criminal penalties; there is no similar requirement that states certify they have the *option* to enforce safety standards through criminal penalties "in a manner substantially the same as provided under" Section 60123.

PG&E would have the Court believe that Congress meticulously considered the civil enforcement provisions in Section 60105 – down to requiring that states certify an understanding of their *options* with respect to civil enforcement – but gave no thought whatsoever to criminal enforcement of the federal floor in the states. But the only logical reading of this inconsistency is that there is no inconsistency at all; that Congress did not reference a state's criminal enforcement options or requirements in Section 60105 because

United States District Court
Northern District of California

that statute ceded only the federal government's *civil* enforcement power, leaving intact federal *criminal* enforcement under Section 60123.

This conclusion is supported by the clarity with which Congress has structured other reverse preemption schemes, where the intent to strip the federal government of criminal enforcement authority has been clear. The Occupational Safety and Health Act ("OSHA"), for example, criminalizes any "willful" violation of a regulation prescribed pursuant to OSHA that causes death. 29 U.S.C. § 666(e). And under OSHA, as under the Pipeline Safety Act, states may submit a "plan for development and enforcement of State standards to preempt applicable Federal standards." 29 U.S.C. § 667(b). But under OSHA, unlike under the Pipeline Safety Act, the reverse preemption provision expressly provides that once the Secretary of Labor approves a state's plan, that plan preempts the aforementioned federal criminal penalty: "Upon making the determination referred to in the preceding sentence, the provisions of section[ ] . . . 666 of this title . . . shall not apply." This comparison demonstrates that where Congress intends for a state certification scheme to preempt federal criminal penalties, it says so directly.

> **c. The Legislative History of the Pipeline Safety Act Supports the Plain Language Reading of Section 60105**

Given that Section 60105 is unambiguous, the Court need not look to legislative history for clarity. In any event, the legislative history of the Pipeline Safety Act indicates that the criminal penalties in Section 60123 are of particular importance to the broader act, providing further support for the plain language reading of Section 60105 as limiting only federal *civil* enforcement.

The stated purpose of the Pipeline Safety Act is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1). When Congress amended the Pipeline Safety Act in 1979 to add criminal penalties, it noted that "[t]he addition of criminal penalties gives recognition to those situations that require more onerous sanctions than civil penalties." S. Rep. No. 96-

United States District Court
Northern District of California

182, at 13 (1979).  This statement indicates a Congressional intent to promote criminal penalties in certain circumstances, making it it unlikely that Congress would have forfeited federal criminal enforcement of the Pipeline Safety Act *sub silentio*, all the while carefully drafting the limitations and protections of federal civil enforcement.

### d.  The Plain Language Reading of Section 60105 Is Consistent with Ninth Circuit Case Law

The recent Ninth Circuit case PG&E cites to support its arguments, *City and County of San Francisco v. United States Department of Transportation*, 796 F.3d 993 (9th Cir. 2015), is not as instructive as PG&E would have the Court believe.  There, motivated by safety concerns following the San Bruno explosion, San Francisco brought suit alleging that the Pipeline and Hazardous Materials Safety Administration ("PHMSA") – the agency responsible for reviewing state certifications under Section 60105 – itself violated the Pipeline Safety Act when it approved California's Section 60105 certification.  796 F.3d at 996.  PG&E cites the Ninth Circuit's comments, in dicta, that "[i]f a state certifies that it has adopted the minimum federal safety standards and is enforcing those standards, the state assumes exclusive regulatory jurisdiction over most intrastate pipelines within its borders" (*id.*), and that "the federalism structure of the Pipeline Safety Act favors state assumption of jurisdiction" (*id.* at 1002).

Despite the centrality of Section 60105 to San Francisco's claims, however, the Ninth Circuit only briefly discussed the statute and never addressed whether it preempts federal criminal enforcement under Section 60123.  Accordingly, the Ninth Circuit's holdings in *City and County of San Francisco* – first, that the Pipeline Safety Act's citizen suit provision does not allow a mandamus-type action against the PHMSA (*id.* at 998-99); and second, that the PHMSA's decision not to reject California's certification was a decision not to enforce rather than a failure to act, and therefore unreviewable under the Administrative Procedure Act (*id.* at 1002) – have no bearing on the case now before the Court.  The comments cited by PG&E therefore provide little insight when considered in the context of these holdings: the comment about "exclusive [state] regulatory jurisdiction"

is simply a correct description of Section 60105, and not even the Government contests that California's certification rendered CPUC the sole regulatory power over intrastate pipelines in California (Opp'n at 2); and the comment about favoring "state assumption of jurisdiction" was relevant only to the Ninth Circuit's holding that judicial review of a federal agency's approval of a state's certification was inappropriate.

The Ninth Circuit decision cited by the Government, on the other hand, does instruct the Court's interpretation of Section 60105. In *United States v. Elias*, 269 F.3d 1003 (9th Cir. 2001), the defendant was charged with violating the Resource Conservation and Recovery Act ("RCRA") for improper disposal of hazardous waste without a permit, pursuant to RCRA's criminal enforcement provision. RCRA, in a manner similar to the Pipeline Safety Act, authorizes states to adopt their own hazardous waste programs: "Any State which seeks to administer and enforce a hazardous waste program . . . may . . . submit to the [EPA] Administrator an application . . . for authorization of such program." 269 F.3d at 1009 (quoting 42 U.S.C. § 6926). And in a manner similar to Section 60105, RCRA provides that once the EPA approves such an application, a "State is authorized to carry out such program *in lieu of the Federal program.*" *Id.* (quoting 42 U.S.C. § 6926) (emphasis added).

On the basis of this state authorization scheme, the defendant in *Elias* argued that "when the EPA authorized Idaho's hazardous waste program, that program replaced and supplanted federal RCRA law, effectively stripping the United States of [criminal] enforcement authority." *Id.* The arguments made in *Elias* were strikingly similar to those now advanced by PG&E. For example, the defendant in *Elias* argued that the EPA's authorization of the Idaho waste program "displaced the federal program, leaving no federal crimes and ousting the federal court of jurisdiction" (*id.*), while PG&E argues that the Secretary of Transportation's certification of the California program displaced the federal regulations such that "there can be no federal criminal violations of those regulations" (Reply at 8), rendering this Court "deprived of jurisdiction" (Mot. at 3).

The Ninth Circuit looked to RCRA's legislative history to determine whether the

8

United States District Court
Northern District of California

criminal provisions at issue in *Elias* survived state authorization:

> [In RCRA's legislative record,] Congress manifested its desire to retain a strong federal presence. Had Congress intended to impose a hitherto unknown limitation upon the scope of its laws criminalizing permit violations, its intentions would surely have been manifested; for example, § 6928(d) would have been reworded to indicate that it applied only to persons in states lacking an authorized state program.

269 F.3d at 1012 (*quoting United States v. MacDonald & Watson Waste Oil Co.*, 933 F.2d 35, 45 (1st Cir. 1991)). On the basis of this history and the plain language of RCRA's state authorization statute, the Ninth Circuit held that "RCRA's criminal enforcement provisions are meant to apply within states having authorized programs." *Id.* at 1011. In effect, this meant that while RCRA's "federal permitting scheme is supplanted by authorized state ones . . . the federal proscription against transporting hazardous waste without a permit remains, as does the federal penalty for it." *Id.* at 1012.

There are certainly substantial differences between the Pipeline Safety Act and RCRA. RCRA's enforcement provision, for example, expressly authorizes the EPA to exercise certain civil and criminal penalties in authorized states (though not the penalties at issue in *Elias*).[2] *See* 42 U.S.C. §§ 6928(a), 6928(d)(4). But there is no similar provision in Section 60123 that expressly authorizes the prosecution of Section 192 violations in certified states.

Nevertheless, *Elias* is the only authority provided by either party that conducts the same type of analysis that the Court has conducted today. Given that the plain language, structure, and legislative history of the Pipeline Safety Act all indicate that Congress did not intend to limit federal criminal enforcement in certified states, as was the case in *Elias*, the Court finds the following analysis from *Elias* to be directly applicable to PG&E:

> Had Congress intended to impose a hitherto unknown limitation upon the scope of its laws criminalizing [Pipeline

---

[2] The Ninth Circuit noted that "[t]his demonstrates 'that Congress did not intend, by authorizing a state program 'in lieu of a Federal program,' to preempt federal regulation entirely,' " and "indicates a general congressional intent to maintain Federal involvement in criminal enforcement post-authorization." *Elias*, 269 F.3d at 1010 (*quoting United States v. Flanagan*, 126 F. Supp. 2d 1284, 1287-88 (C.D. Cal. 2000)).

9

> Safety Act] violations, its intentions would surely have been manifested; for example, [Section 60123] would have been reworded to indicate that it applied only to persons in states lacking [a certified] state program.

*Elias*, 269 F.3d at 1012.  Indeed, Congress has demonstrated precisely this sort of careful drafting in other sections of the Pipeline Safety Act, which expressly limit the Secretary of Transportation's authority to take certain actions.  *See* 49 U.S.C. § 60108(b)(1) ("The Secretary shall inspect and require appropriate testing of a pipeline facility subject to this chapter *that is not covered by a certification under section 60105 of this title.*") (emphasis added).

This Court therefore follows the Ninth Circuit's reasoning in *Elias*, albeit under different circumstances, and concludes that in effect, while the Pipeline Safety Act's "federal [regulatory] scheme is supplanted by [certified] state ones . . . the federal proscription against [violation of the Pipeline Safety Act] remains, as does the federal penalty for it."  *Elias*, 269 F.3d at 1012.

**IV.     The Federal Crime Under Section 60123**

In fact, PG&E concedes that Section 60105 does not preempt federal criminal prosecutions under Section 60123.  Reply at 5 ("PG&E does not contend that Section 60105 limits the Attorney General's authority to prosecute any federal crime.").  PG&E explains that, even under its reading of the Pipeline Safety Act, the Attorney General could still prosecute the "71 percent" of natural gas pipeline operators that run interstate operations; all pipeline operators in non-certified states; and all pipeline operators for the crimes explicitly enumerated in Section 60123(b)-(d).  *Id.* at 5-6.

Instead, PG&E argues that there is no federal crime for the Attorney General to prosecute in this case because the Indictment "alleges only violations of regulations prescribed under the Pipeline Safety Act," and the Secretary of Transportation cannot "prescribe" such regulations in certified states like California.  Mot. at 7-8.

United States District Court
Northern District of California

This argument is not persuasive. First, Section 60105 does not un-write the regulations prescribed pursuant to the Pipeline Safety Act, such as those contained in Section 192. While the Secretary of Transportation cannot enforce such regulations in certified states under Section 60105, the statute does not limit the Attorney General's enforcement powers under Section 60123, for all of the reasons discussed above. Whether the Pipeline Safety Act directly governs an intrastate pipeline's conduct is therefore irrelevant; Section 60123 defines a set of crimes – knowing and willful violation of regulations prescribed under the Pipeline Safety Act – applicable to *all* pipeline operators within the United States, including PG&E.

Second, Congress added criminal penalties to the Pipeline Safety Act to address "those situations that require more onerous sanctions than civil penalties." S. Rep. No. 96-182, at 13 (1979). The Court cannot agree that Congress would have simultaneously retained the Attorney General's power to prosecute federal crimes under Section 60123 and *sub silentio* stripped the Pipeline Safety Act's only criminal provision of any teeth as to intrastate pipelines in certified states. The very purpose of the Pipeline Safety Act is to "protect[] against risks to life and property posed by pipeline transportation and pipeline facilities" (49 U.S.C. § 60102(a)(1)), and nothing indicates that Congress prioritized risks posed by interstate pipelines over those of intrastate pipelines. Indeed, intrastate pipelines can be equally as dangerous, as evidenced by the loss of lives and property at issue in this case, and Congressional intent would be frustrated by any conclusion that absolved intrastate pipeline operators in certified states of all criminal liability.

**V.    The Rule of Lenity**

Finally, PG&E argues that if any ambiguity remains, the rule of lenity requires that it be resolved against the Government. Mot. at 12-13.

The rule of lenity "requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government." *United States v. Romm*, 455 F.3d 990, 1001 (9th Cir. 2006). Courts should only invoke the rule of lenity in

11

"those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 111 (1990). *See also United States v. LeCoe*, 936 F.2d 398, 402 (9th Cir. 1991) ("Despite its lofty ideals, the rule of lenity is not an automatic addendum that accompanies every criminal statute that Congress may choose to enact; rather, it is simply a canon of statutory construction. The rule plays no role in statutory interpretation unless the statute is truly ambiguous.") (citation omitted).

The Supreme Court has identified two policies underlying the rule of lenity. First, fairness requires that "warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *United States v. Bass*, 404 U.S. 336, 348 (1971) (citation omitted). Second, "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Id.*

After considering the plain meaning of Section 60105, and the structure, legislative history and motivating policies of the Pipeline Safety Act, no ambiguity remains. Indeed, even PG&E agrees that there was never ambiguity regarding whether Section 60105 bars prosecution under Section 60123. Reply at 5. The only potential for ambiguity therefore lies with Section 60123, but as discussed above, that statute defines a federal crime applicable to PG&E in unambiguous terms.

Moreover, this is simply not a case where the policies underlying the rule of lenity come into play. PG&E has not argued that the "warning" given by either Section 60105 or Section 60123 was difficult to understand; the briefing here has not involved dickering about where a "certain line" was and whether that line was "passed." *Bass*, 404 U.S. at 348. Indeed, the Government argues that PG&E's internal safety rules state that their "purpose is to implement the federal regulations," and cite the very regulations which PG&E now seeks to avoid by arguing that their applicability was ambiguous. Oct. 19, 2015 Tr. at 12.

12

Accordingly, the Court finds that the rule of lenity does not apply and does not bar prosecution in this case.

**CONCLUSION**

For the reasons set forth above, PG&E's motion is DENIED.

**IT IS SO ORDERED.**

Dated:   12/23/15

_____
THELTON E. HENDERSON
United States District Judge

United States District Court
Northern District of California

13