BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

HALLIE MITCHELL HOFFMAN (CABN 210020)
OWEN P. MARTIKAN (CABN 177104)
HARTLEY M. K. WEST (CABN 191609)
JEFFREY B. SCHENK (CABN 234355)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7129
    Fax: (415) 436-7234
    hallie.hoffman@usdoj.gov
    owen.martikan@usdoj.gov
    hartley.west@usdoj.gov
    jeffrey.b.schenk@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 14-00175 TEH |
| Plaintiff, | UNITED STATES' TRIAL MEMORANDUM |
| v. | Trial: March 22, 2016 |
| | PTC: March 7, 2016 |
| PACIFIC GAS AND ELECTRIC COMPANY, | Court: Hon. Thelton E. Henderson |
| Defendant. | |

The United States of America respectfully submits this Trial Memorandum addressing the evidence to be submitted and the potential legal issues to be raised during the trial in the above-captioned matter.

## I. INTRODUCTION

On September 9, 2010, a gas line owned and operated by PG&E ruptured, causing a fire that killed eight people and injured fifty-eight others. The fire also damaged 108 homes, thirty-eight of which were completely destroyed. The National Transportation Safety Board (NTSB) began an

1  investigation the day after the explosion, which examined the cause of the explosion, the characteristics

UNITED STATES' TRIAL MEMORANDUM
CR 14-00175 TEH

and history of the failed pipeline, the adequacy of PG&E's emergency response, and PG&E's operations. The investigation revealed a number of deficiencies in PG&E's record keeping, Integrity Management program, and maintenance practices as they related to various sections of the pipeline – including Line 132, the line that ruptured in San Bruno.

## II.     SUMMARY OF RELEVANT PROCEEDINGS

### A.  Superseding Indictment

In July 2014, a Grand Jury returned a Superseding Indictment charging PG&E with twenty-seven counts of willfully violating the Natural Gas Pipeline Safety Act (PSA), 49 U.S.C. § 60123, arising out of the deficiencies found by the NTSB, and with one count of obstructing the NTSB's investigation of the San Bruno explosion and PG&E's Integrity Management program, under 18 U.S.C. § 1505. Specifically, the Superseding Indictment charges willful violations of the following regulations promulgated under the PSA:

   Counts 2-3:    49 C.F.R. § 192.917(b) – Failure to gather and integrate existing data and information;

   Counts 4-5:    49 C.F.R. § 192.709(a) – Failure to maintain records;

   Counts 6-8:    49 C.F.R. § 192.917(a) – Failure to identify and evaluate potential threats;

   Counts 9-14:   49 C.F.R. § 192.919 – Failure to include potential threats in Baseline Assessment Plan and to select most suitable assessment method;

   Counts 15-18:  49 C.F.R. § 192.917(e)(3) – Failure to prioritize as high risk after changed circumstances rendered manufacturing threats unstable;

   Counts 19-23:  49 C.F.R. § 192.917(e)(4) – Failure to prioritize ERW pipe as high risk after changed circumstances rendered manufacturing threats unstable and to analyze to determine risk of failure; and

   Counts 24-28:  49 C.F.R. § 517(a) – Failure to retain strength test pressure records.

The Superseding Indictment also seeks a fine exceeding the statutory maximum for these offenses under the Alternative Fines Act. Docket (Dkt.) 22.

/ / /

/ / /

### B. Dismissal or Consolidation of Multiplicitous Counts

In its December 23, 2015 Order, the Court granted without prejudice defendant's motion to dismiss for multiplicity dismissing Counts 3, 7, 8, 10-14, 16-18, and 20-23, based on its finding that a course of conduct is the proper unit of prosecution for the Integrity Management regulations promulgated under the PSA. Order at 13 (Dkt. 217). The Court ordered the parties to file a statement detailing their positions as to whether amendment of the indictment was necessary. *Id.* On January 19, 2016, the government filed a statement explaining why it believes consolidation of the multiplicitous counts is more appropriate than dismissal. Dkt. 254. The government's Proposed Verdict Form reflects this proposed consolidation.

### C. Bifurcation of Alternative Fine Determination

Regarding the Alternative Fines Act, the Court ordered dismissal of the loss allegations, reserved ruling on the gain allegations, and requested that the parties address bifurcation of the guilt and penalty phases in their pretrial conference statement. Dkt. 201, 275. The government's Proposed Alternative Fine Verdict Form reflects this bifurcation.

## III. ELEMENTS OF THE OFFENSES

<u>Count 1:</u>   18 U.S.C. § 1505 – Obstruction of Agency Proceeding

(1) There was a pending agency proceeding;

(2) Defendant was aware of that proceeding;

(3) Defendant intentionally endeavored corruptly to influence, obstruct or impede that proceeding while it was pending; and

(4) Defendant's conduct was material to the pending proceeding.

<u>Counts 2-3:</u>   49 C.F.R. § 192.917(b) – Failure to gather and integrate existing data and information

(1) Defendant was a person within the meaning of the Pipeline Safety Act; and

(2) Defendant engaged in a course of conduct of knowingly and willfully failing to gather and integrate existing data and information on its pipelines that could be relevant to identifying and evaluating all potential threats on covered segments of the pipelines.

///

UNITED STATES' TRIAL MEMORANDUM
CR 14-00175 TEH                                           3

Counts 4-5:     49 C.F.R. § 192.709(a) – Failure to maintain records

(1) Defendant was a person within the meaning of the Pipeline Safety Act; and

(2) Defendant engaged in a course of conduct of knowingly and willfully failing to maintain records concerning the date, time, location, and description of repairs made to its pipelines.

Counts 6-8:     49 C.F.R. § 192.917(a) – Failure to identify and evaluate potential threats

(1) Defendant was a person within the meaning of the Pipeline Safety Act; and

(2) Defendant engaged in a course of conduct of knowingly and willfully failing to identify and evaluate potential threats to covered pipeline segments.

Counts 9-14:   49 C.F.R. § 192.919 – Failure to include potential threats in Baseline Assessment Plan and to select most suitable assessment method

(1) Defendant was a person within the meaning of the Pipeline Safety Act; and

(2) Defendant engaged in a course of conduct of knowingly and willfully failing to include in its Baseline Assessment Plans all potential threats on covered segments, and failed to select integrity assessment methods that were best suited to address those identified potential threats.

Counts 15-18: 49 C.F.R. § 192.917(e)(3) – Failure to prioritize as high risk after changed circumstances rendered manufacturing threats unstable

(1) Defendant was a person within the meaning of the Pipeline Safety Act;

(2) Defendant identified threats of manufacturing and construction defects, including seam defects, in covered segments;

(3) Changed circumstances rendered the identified threats of manufacturing and construction defects unstable; and

(4) Following the changed circumstances, defendant engaged in a course of conduct of knowingly and willfully failing to prioritize the covered segments as high-risk segments for its Baseline Assessment Plans.

Counts 19-23: 49 C.F.R. § 192.917(e)(4) – Failure to prioritize ERW pipe as high risk after changed circumstances rendered manufacturing threats unstable and to analyze to determine risk of failure

(1) Defendant was a person within the meaning of the Pipeline Safety Act;

(2) Covered segments containing low-frequency electric resistance welded pipe, or lap-welded

pipe, or pipe satisfying the conditions specified in ASME/ANSI B31.8S, Appendices A4.3 and A4.4, experienced seam failure or operating pressure increased over the maximum operating pressure experienced by that covered segment during the preceding five years; and

(3) Defendant engaged in a course of conduct of knowingly and willfully failing to prioritize that covered segment as a high-risk segment for the baseline assessment or a subsequent re-assessment.

Counts 24-28: 49 C.F.R. § 517(a) – Failure to retain strength test pressure records

(1) Defendant was a person within the meaning of the Pipeline Safety Act; and

(2) Defendant engaged in a course of conduct of knowingly and willfully failing to retain for the useful life of its pipelines strength test pressure records that included the test medium, the test pressure and duration, pressure recording charts, significant elevation variations, any leaks and failures noted, and the employee who performed the test.

## IV. SUMMARY OF THE GOVERNMENT'S EVIDENCE

The United States intends to prove this case largely through documentary and testimonial evidence, as well as physical evidence of an exploded portion of PG&E's transmission pipeline 132, segment 180. San Bruno firefighter Scott Waldvogel, a first responder at the San Bruno explosion on September 9, 2010, will explain that the area where Segment 180 was located is a neighborhood populated with single family homes. He will describe the gas fire, and how it differed from other types of fires he has experienced. He will note the number of people killed and injured in the explosion, and the number of homes damaged and destroyed, but will not describe the manner of death, injuries, or destruction in graphic detail so as to minimize any risk of unfair prejudice.

The government will call Steve Nanney, a Senior Engineer with Pipeline and Hazardous Materials Safety Administration (PHMSA), to explain the requirements and meaning of the Pipeline Safety Act and its enforcing regulations, the Minimum Federal Safety Standards, relevant in this case. He will testify that the Minimum Federal Safety Standards were adopted to protect against risks to people and property, recognizing that the transmission of natural gas can be hazardous. He will explain that utilities are required to maintain certain repair records for as long as a pipe remains in service, and to make and retain for the useful life of the pipe certain strength test pressure records, because such

UNITED STATES' TRIAL MEMORANDUM
CR 14-00175 TEH                                5

records must be used to protect against potential threats.  *See* 49 C.F.R. § 192.517(a) and § 192.709(a).

Nanney will describe the background and adoption of Subpart O, the Gas Transmission Pipeline Integrity Management (IM) regulations, and terminology used in these regulations.  He will explain that the IM regulations apply to pipe segments in "high consequence areas" (HCAs); the meaning of HCA, both generally (high population areas) and specifically (with reference to class locations and potential impact radius); and how HCAs are determined.  Nanney will explain that the IM regulations require natural gas operators to identify and evaluate potential threats – with reference to standards promulgated by the American Society of Mechanical Engineers (ASME), specifically B31.8, which is incorporated in the regulations – and describe the types of potential threats.  *See* 49 C.F.R. § 192.917(a).  He will describe the operator's duty to gather and integrate existing data, and the kinds of data this covers.  *See* 49 C.F.R. § 192.917(b).

Nanney will further explain that the IM regulations require operators to assess manufacturing threats on certain kinds of pipe (distinguishing 49 C.F.R. § 192.917(e)(3) and (e)(4)), and to prioritize HCA segments as high risk in the operator's "Baseline Assessment Plan" if certain circumstances change, rendering the threats unstable.  He will describe what constitutes a manufacturing threat and changed circumstances, and the different assessment methods and their uses.  In particular, he will explain that exceedances over maximum operating pressure (MOP) and increases in the maximum allowable operating pressure (MAOP) trigger a duty to hydrotest, "ILI," or replace a covered segment where there is an unstable manufacturing threat.  He will explain that hydrotesting involves running water through the pipes at a pressure far over the MAOP, to push any latent defects to fail, with the idea that water will cause little harm in the event of failure, whereas failure with natural gas can result in a massive explosion, as happened in San Bruno.  This is all the more important, he will explain, because the testing by definition occurs only in high-population areas.  Finally, Nanney will describe what must be included in a Baseline Assessment Plan and subsequent assessment plans, including all potential threats on segments in HCAs and the reasons behind selected assessment methods.  *See* 49 C.F.R. § 919.

The government will call current and former PG&E employees, as well as PG&E contractors, to establish that PG&E understood its record-keeping and IM regulatory obligations, and knew its record-keeping systems were incomplete and inaccurate.  Margaret Felts will provide summary evidence about

UNITED STATES' TRIAL MEMORANDUM
CR 14-00175 TEH                                           6

the poor record-keeping based on her review of the company's records, record-keeping policies, and practices. Leslie McNiece will testify that she was hired after the San Bruno explosion to fix PG&E's records system but that she experienced pushback from PG&E management when she tried to improve it. She will also testify about a Line 132 survey map she found in a dumpster, with handwritten notations about gas leaks that had not been recorded in PG&E's electronic data system.

      Through PG&E witnesses and records, the government will establish that PG&E knew it had manufacturing threats on the charged lines, that pressure on these lines exceeded MAOP and/or MOP, and that many of these exceedances occurred as a result of PG&E intentionally spiking the pressure on its lines. These witnesses and records will further establish that PG&E chose not to consider the threats destabilized unless the pressure exceeded MAOP or MOP by more than 10%, despite knowing that the regulations do not provide such a 10% cushion. PG&E's Baseline Assessment Plan and subsequent assessment plans show that PG&E did not identify the charged lines as having unstable manufacturing threats; did not schedule them for hydrotesting, ILI, or replacement; and did not prioritize them as high risk. These witnesses and records will also show that PG&E never conducted or intended to conduct these assessments prior to the San Bruno explosion, and that ILI was not a practicable assessment method for these lines. Witnesses and records will show that PG&E scheduled these lines for external corrosion direct assessment, which is not capable of addressing these destabilized manufacturing threats, and that it did so for cost reasons. Moreover, gas utility expert Howard Lubow will testify, based on his extensive knowledge of the industry, that PG&E focused on maximizing profits at the expense of safety.

      The government also intends to prove through PG&E witnesses and records, and through witnesses and records of the NTSB and PHMSA, that the NTSB commenced an investigation immediately after the San Bruno explosion. They will provide evidence as to the scope of the investigation, as well as PG&E's involvement in and obstructive behavior during that investigation. These witnesses and records will show that, in response to a data request from the NTSB concerning PG&E's planned and unplanned pressure increases exceeding MAOP and/or MOP, PG&E submitted a Risk Management Instruction (RMI-06) that explained PG&E's practice with regard to its 10% cushion. On April 6, 2011, however, PG&E sent the NTSB a version of RMI-06 that did not contain the 10% cushion, accompanied by a letter claiming PG&E had "no indication that [the 10% version] was ever

approved."

Finally, the government intends to prove PG&E's gross gains from its regulatory violations by showing the cost of coming into compliance, which it will do through PG&E's own records and through summary witnesses. These records will reveal PG&E's stated cost per mile for hydrotesting and the number of miles in each of the indicted lines. They will also show PG&E's stated costs for bringing its record-keeping system into compliance.

The government expects to establish these facts over the course of four trial weeks.

DATED: February 22, 2016          Respectfully submitted,

BRIAN J. STRETCH
Acting United States Attorney

/s/
_____
HALLIE MITCHELL HOFFMAN
OWEN P. MARTIKAN
HARTLEY M. K. WEST
JEFF SCHENK
Assistant United States Attorneys