1
2
3
4
5
6
7
8
9
10

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

PACIFIC GAS AND ELECTRIC COMPANY,

        Defendant.

Case No. 14-cr-00175-TEH-1 (MEJ)

**ORDER RE: APPLICATIONS FOR RULE 17(C) SUBPOENAS**

Re: Dkt. Nos. 312, 349

11

**INTRODUCTION**

12
13
14
15
16

Pending before the Court are two Applications by the government seeking leave to subpoena the production of certain materials before trial pursuant to Federal Rule of Criminal Procedure ("Rule") 17(c). First Appl., Dkt. No. 312; Sec. Appl., Dkt. No. 349. Having reviewed the briefing on this matter, the relevant legal authorities, and the background of this case, the Court issues the following order.

17

**BACKGROUND**

18

**A.    Procedural Background**

19
20
21
22
23
24
25
26
27

On February 24, 2016, the government filed an *ex parte* Application for the issuance of a subpoena *duces tecum* to Defendant Pacific Gas and Electric Company ("PG&E") pursuant to Rule 17(c). Dkt. No. 312. PG&E objected the same day, requesting the Court either outright deny the government's Application as improper or issue an order converting it into a noticed motion under Criminal Local Rule 47-2 to grant PG&E an opportunity to file a substantive response by February 29, 2016. Dkt. No. 315. The undersigned, having conferred with the presiding judge, the Honorable Thelton E. Henderson, permitted full briefing on this issue. Dkt. No. 320. PG&E filed its Opposition on February 29, 2016 (Dkt. No. 322), and the government filed its Reply on March 3, 2016 (Dkt. No. 330). In addition, one of the government's subpoena requests relates to

28

potential witnesses in this matter, and consequently, counsel for certain of the potential witnesses[1]

submitted objections to the government's Application.  First Objections ("First Objs."), Dkt. No.

406.  On March 9, 2016, Judge Henderson formally referred the Rule 17 requests to the

undersigned for this matter and any other that may be filed for the remainder of the case.  Referral

Order, Dkt. No. 348.[2]

Following the referral order, the government filed its second Application for the issuance

of a subpoena (Dkt. No. 249), this time requesting the production of documents from "law firms

and attorneys representing PG&E's current and/or former employees and contractors[.]"  Sec.

Appl. Br. at 2, Dkt. No. 349-1; *see also id.* at 2-5 (listing the names of all the current/former

employees and their counsel as well as counsels' contact information).  Counsel for some of the

witnesses have again objected to the government's second Application.  Second Objections

("Second Objs."), Dkt. No. 407.  PG&E did not file objections to this second Application.

**B.      The Proposed Subpoenas**

1.      <u>The First Application</u>

In its first Application, the government moves for the issuance of a subpoena *duces tecum*

to PG&E for the following documents:

A.      For the following individuals, (1) the complete personnel files, including hiring contracts and separation agreements; (2) all payments to or for the benefit of the employee/former employee; and (3) all records and communications regarding retention of counsel for the employee/former employee, including but not limited to retention letters, retention agreements, and payments.

---

[1] The Objections do not state specifically which witnesses object to the government's Applications.

[2] The undersigned is the discovery magistrate judge in this action (*see* Discovery Referral, Dkt. No. 200); however—to be clear—Rule 17 is not a discovery device and may not be used as such (*see infra* "Legal Standard").  Accordingly, the undersigned only considers this matter pursuant to Judge Henderson's specific referral as to the Rule 17 subpoena requests.  *See* Rule 17 Referral Order ("Pursuant to Federal Rule of Criminal Procedure 59 and Civil Local Rule 72-1, this matter is referred to Magistrate Judge Maria-Elena James for a pretrial determination of any pending or forthcoming requests for subpoenas under Federal Rule of Criminal Procedure 17, including the Government's February 24, 2016 request.").

United States District Court
Northern District of California

| David Aguiar | Alan Eastman | Leslie McNiece |
|---|---|---|
| William (Bill) Arndt | Robert (Bob) Fassett | Lawrence (Larry) Medina |
| Les Buchner | David Harrison | William (Bill) Morrow |
| Glen Carter | William (Bill) Hayes | Eugene (Gene) Muse |
| Brian Cherry | Todd Hogenson | Sara Burke Peralta |
| Ravindra Chhatre | Kirk Johnson | Charles Tateosian |
| Daniel Curtis | Chih Hung Lee | Chris Warner |
| Peter Darbee | Calvin Lui | Michael West |
| Brian Daubin | William (Bill) Manegold | |
| Frank Dauby | Frank Maxwell | |

    B.      All versions, draft and otherwise, of PG&E's Risk Management Instruction (RMI)-06.

    C.      April 16, 2011 email, including metadata and attachments, from William Hayes to Ravindra Chhatre and Sunil Shori, subject "Data Response for NTSB_036-005-Amended-2."

    D.      The documents and data contained in the web links embedded in the following records:
        1.    5/3/2010 email from Calvin Lui to William Manegold (PGE_DOJ_0874853);
        2.    10/14/2010 email from Thomas Crawford to Frank Dauby (PGE_DOJ_8561403); and
        3.    3/31/2011 email from Calvin Lui to William Manegold (PGE_DOJ_1209668).

First Appl. at 2-3.

    2.   <u>The Second Application</u>

       In its second Application, the government moves for issuance of subpoenas *duces tecum* to law firms and attorneys representing PG&E's current and/or former employees and contractors. Those current and/or former employees and contractors are: David Aguiar, Bill Arndt, Glen Carter, Alfonsa Cornejo-Maldonado, Peter Darbee, Brian Daubin, Franky Dauby, Alan Eastman, Robert Fassett, William Hayes, Todd Hogenson, Kirk Johnson, Chih Hung Lee, Calvin Lui, William Manegold, Frank Maxwell, Gene Muse, Sara Peralta, Karen Roth, Edward Salas, Charles Tateosian, Chris Warner, and Jane Yura.  Sec. Appl. Br. at 2-5.

United States District Court
Northern District of California

1    For those individuals, the government seeks:

2        (1) all non-privileged records and communications regarding
3        retention for representation; and (2) all billing records, including
         nonprivileged time entries, relating to *United States v. Pacific Gas
4        and Electric Company* (CR 14-00175) or any investigation by the
         U.S. Attorney's Office for the Northern District of California related
5        to PG&E. If any responsive documents within the scope of this
         subpoena are withheld on the basis of a claimed privilege, please
6        provide a privilege log describing the basis for withholding any
         responsive document, including on the basis of attorney-client
7        privilege.

8    *Id.* at 2.

9                                **LEGAL STANDARD**

10        Federal Rule of Criminal Procedure 17(c) provides that a subpoena "may order the witness

11   to produce any books, papers, documents, data, or other objects the subpoena designates.  The

12   court may direct the witness to produce the designated items in court before trial or before they are

13   to be offered in evidence."  Fed. R. Crim. P. 17(c)(1).  In this District, "[n]o subpoena in a

14   criminal case may require the production of books, papers, documents or other objects in advance

15   of the trial, hearing or proceeding at which these items are to be offered in evidence, unless the

16   Court has entered an order pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure."

17   Crim. L.R. 17-2(a).  "An order permitting issuance of a Rule 17(c) subpoena may be obtained by

18   filing either a noticed motion pursuant to Crim. L.R. 47-2 or, for good cause, an ex parte motion

19   without advance notice to the opposing party."  *Id.* 17-2(a)(1).  Additionally, "[a] party requesting

20   a subpoena must support its request by a declaration specifying the facts supporting the issuance

21   of the subpoena along with a proposed order."  *Id.*  The Court will then "determine whether the

22   material sought should be produced.  In issuing an order granting the motion, the Court may place

23   limits on the scope of the requested production."  *Id.* 17-2(a)(2).

24        A subpoena *duces tecum* under Rule 17 "was not intended to provide a means of discovery

25   for criminal cases," but instead offers a way "to expedite the trial by providing a time and place

26   before trial for the inspection of subpoenaed materials."  *United States v. Nixon*, 418 U.S. 683,

27   689-99 (1974) (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)).  In this

28   sense, a Rule 17(c) subpoena reaches only *evidentiary* materials—not all *discoverable* materials.

United States District Court
Northern District of California

                                          4

United States District Court
Northern District of California

1    Accordingly, the party seeking pretrial production bears the burden of establishing "(1) relevancy;

2    (2) admissibility; and (3) specificity." *Id.* at 700.  In addition, the Court must be persuaded by the

3    moving party: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise

4    procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot

5    properly prepare for trial without such production and inspection in advance of trial and that the

6    failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the

7    application is made in good faith and is not intended as a general "fishing expedition." *United*

8    *States v. Krane*, 625 F.3d 568, 574 (9th Cir. 2010) (quoting *Nixon*, 418 U.S. at 699-700).  Further,

9    a Rule 17(c) subpoena "should be quashed or modified if it calls for privileged matter." *United*

10   *States v. Reyes*, 239 F.R.D. 591, 598 (N.D. Cal. 2006) (quotation and citation omitted).

11          "[W]here a party fails to sufficiently demonstrate the *Nixon* factors to the Court, advance

12   production of the records sought will be denied." *United States v. Carn*, 2016 WL 128138, at *1-2

13   (D. Nev. Jan. 11, 2016) (citing *United States v. Fields*, 663 F.2d 880, 881 (9th Cir. 1981); *United*

14   *States v. Eden*, 659 F.2d 1376, 1381 (9th Cir. 1981) (quashing subpoena where request was based

15   on only conclusory statements)).  This "protect[s] against misuse or improvident use of such

16   subpoenas." *United States v. Binh Tang Vo*, 78 F. Supp. 3d 171, 178 (D.D.C. 2015) (quotation

17   omitted).  It is up to the discretion of the trial court to determine whether a Rule 17(c) subpoena

18   application has met the *Nixon* requirements, *Eden*, 659 F.2d at 1381, and the court's determination

19   "will not be disturbed unless clearly arbitrary or without support in the record," *United States v.*

20   *Reed*, 726 F.2d 570, 577 (9th Cir. 1984) (*citing Nixon*, 418 U.S. at 702; *United States v. MacKey*,

21   647 F.2d 898, 901 (9th Cir. 1981)).

## PRELIMINARY OBJECTIONS

23          As an initial matter, PG&E argues it is improper for the government to attempt to utilize

24   Rule 17 to obtain the information it seeks.  Opp'n at 3-6.  PG&E asserts that the Rule 17(c) device

25   is usually used by the defendant to obtain evidentiary materials from third parties.  *Id.* at 4 & n.5.

26   Consequently, it suggests the government is inappropriately trying to work around Federal Rule of

27   Criminal Procedure 16's limited discovery options and seek out information it could have, but

28   failed to, obtain pre-indictment through the grand jury.  *Id.* at 3-6.

United States District Court
Northern District of California

1       First, PG&E has provided no authority demonstrating it is improper for the government to

2   use a Rule 17(c) subpoena to obtain relevant, evidentiary material for trial.  Indeed, in the

3   paradigmatic Rule 17(c) case of *United States v. Nixon*, the United States Supreme Court

4   considered a Rule 17(c) subpoena from a Special Prosecutor investigating President Richard

5   Nixon.  418 U.S. at 687-88 ("upon motion of the Special Prosecutor . . . a subpoena *duces tecum*

6   was issued pursuant to Rule 17(c) to the President"); *see also MacKey*, 647 F.2d at 899-901

7   (affirming district court's enforcement of a Rule 17(c) subpoena from the government to a

8   defendant in a Sherman Act price-fixing case); *United States v. Gel Spice Co.*, 601 F. Supp. 1214,

9   1223 (E.D.N.Y. 1985) (holding "a defendant may be compelled to produce documents pursuant to

10   a subpoena after an information has been filed even though the documents may be used as

11   evidence against him." (collecting cases)); 2 Charles Alan Wright et al., Federal Practice and

12   Procedure Criminal § 275 (4th ed. 2015) ("Rule 17 generally is available to any 'party' and this is

13   no less true of Rule 17(c).  Thus, the government, as well as the defendant, may use the rule,

14   subject, of course, to such limitations as are imposed by the Fourth and Fifth Amendments."

15   (footnote and collected cases omitted)).

16       Second, as to PG&E's arguments about the government's alleged attempts to circumvent

17   the government's traditional criminal discovery methods, having reviewed PG&E's authorities on

18   this issue, the Court is satisfied that the test set forth in *United States v. Nixon* "ensure[s] that the

19   balance struck by the Federal Rules of Criminal Procedure is preserved[.]"  *United States v.

20   Barnes*, 2008 WL 9359654, at *2 (S.D.N.Y. Apr. 2, 2008) (cited in Opp'n at 4); *see also United

21   States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980) (admonishing courts to "be careful that

22   [R]ule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation

23   of discovery in criminal cases found in Fed. R. Crim. P. 16" and finding one of the subpoenas in

24   that case should have been quashed because the requesting party only made "a very slight showing

25   of the *evidentiary* nature of the material sought." (emphasis added)); *see also United States v.

26   Johnson*, 2008 WL 62281, at *4 (N.D. Cal. Jan. 4, 2008) (relying on *Nixon*'s "specificity"

27   requirement to prevent improper use of Rule 17(c) as a discovery tool: "this is not merely an

28   improper fishing expedition, this a net cast blindly from an ocean troller in the mere hope of

dredging some speculative treasure from the bottom of the sea.").  The Court applies *Nixon*'s requirements to ensure that Rule 17(c) is not improperly used as a discovery device.

## ANALYSIS

### A.        Request A of First Application and Second Application

Because of the similar nature of the information sought in request A of the first Application and request A of the second Application, the Court considers them together.

#### 1.        Background for the Requests

In request A of its first Application, the government seeks the "complete" personnel records and payment records of 27[3] current and former PG&E employees who are potential witnesses at trial, as well "all records and communications regarding retention of counsel" for those current and former employees.  First Appl. at 2.  The government explains the records sought "will allow the United States to demonstrate potential bias of PG&E employees and contractors, both current and former, who may be witnesses at trial."  *Id.* at 3 (citing Declaration of Hartley M. K. West ("West Decl.") ¶ 2, Dkt. No. 313).  The government proffers these records will show the employees' and contractors' compensation structure, bonuses, and other payments from PG&E.  West Decl. ¶ 2.  Specifically, the government contends these records will contain (1) "severance agreements, which the United States is advised, condition payments on the witness not saying anything adverse to PG&E;" and (2) evidence that "PG&E selected and is paying for the witnesses' attorneys."  *Id.*

PG&E argues the information the government seeks is "highly sensitive" and runs afoul of California's constitutional right to privacy.  Opp'n at 7.  It further argues that under California law, companies like PG&E are required to indemnify their employees, including by paying legal fees.  *Id.*  PG&E also insists the prosecution demanded it arrange and pay for separate counsel for these employees.  *Id.* at 2 n.2; 7.  Counsel for some of the witnesses likewise contend this infringes on their privacy interests and the government has not provided sufficient justification to

---

[3] *See* Reply at 2 ("The government's motion lists 28 PG&E witnesses, but one of them, Glen Carter, has been removed from the government's witness list and is no longer a subject of this motion.").

United States District Court
Northern District of California

obtain these records.  First Objs. at 2-5.  They argue the government has failed to meet the standard in *Nixon* to properly subpoena these documents before trial.  *Id.*

In its Reply, the government for the first time suggests that it might use this evidence for more than just impeachment purposes.  Reply at 3.  It indicates it plans to use these records to show "PG&E's consciousness of guilt" because, according to the government, they will show that "PG&E use[d ] money to coerce favorable testimony."  *Id.*  As this argument was only raised in the government's Reply, neither PG&E nor the witnesses had the opportunity to respond.

In its second Application, the government seeks similar information to request A of its first Application, but this time it seeks that information from the witnesses' attorneys and law firms.  Specifically, the government seeks "all non-privileged records and communications regarding retention for representation" and "all billing records, including non-privileged time entries" related to this case or any other investigation by the U.S. Attorney's Office related to PG&E.  Sec. Appl. Br. at 2.  The government's supporting declaration indicates that it seeks these materials so that "the United States may demonstrate potential bias of PG&E employees and contractors, both current and former, who may be witnesses at trial."  Declaration of Jeff Shenk ("Shenk Decl.") ¶ 2, Dkt. No. 349-2.  The government notes that certain witnesses objected to the government's first Application and thus argues they are unlikely to turn over this information willingly.  *Id.*

2.   <u>Analysis</u>

In weighing the government's requests, the Court considers whether the government has met its burden to overcome the three "hurdles" set forth in *Nixon*: specificity, relevance, and admissibility.  *Nixon*, 418 U.S. at 700.

a.   *Request A of the First Application*

The specificity requirement may be "satisfied if there is a 'sufficient likelihood,' demonstrated through rational inferences, that the documents being sought contain relevant and admissible evidence."  *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006) (quoting *Nixon*, 418 U.S. at 700); *see also Bowman Dairy Co.*, 341 U.S. at 219-20 (the party requesting a Rule 17(c) subpoena must show that the materials sought are evidentiary or at least that the request makes a "good faith effort . . . to obtain evidence.").  In *Nixon*, for instance, the Supreme Court

considered whether the district court erred in finding the Special Prosecutor had met Rule 17(c)'s requirements for issuing a subpoena for President Nixon's tape recordings and documents relating to conversations with aides and advisors. 418 U.S. at 688-89, 698-702. The Supreme Court found that while the "contents of the subpoenaed tapes could not . . . be described fully by the Special Prosecutor, [] there was a sufficient likelihood that each of the tapes contain[ed] conversations relevant to the offenses charged in the indictment." *Id.* at 700. For several of those tapes, this "likelihood" was supported by "sworn testimony or statements of one or more of the participants in the conversations as to what was said at the time." *Id.* For other tapes, "the identity of the participants and the time and place of the conversations, taken in their total context, permit[ed] a rational inference that at least part of the conversations relate to the offenses charged in the indictment[,]" which included conspiracy to defraud and to obstruct justice. *Id.* at 687, 700.

Here, the government has failed to establish that request A of its First Application is reasonably specific. While the government explains that it generally seeks this information for impeachment purposes, it has not articulated why there is a "sufficient likelihood" that the witnesses' "complete personnel files," "all payments to or for" their benefit, and "all records of communication about their retention and payment of counsel" will include relevant and admissible evidence. The government's request is very broad and seeks information that is unlikely to ever be used as evidence at trial. *See United States v. Booth*, 2011 WL 6139062, at *2 (D. Nev. Dec. 9, 2011) (recognizing that "[t]he best clue as to the intent to 'fish' is the repeated use of the words 'any,' 'all,' and 'any and all'").

For instance, production of witnesses' complete personnel files and payment records (subparts 1 and 2 of request A) is likely to include information such as number of sick days taken, performance reviews, regular salary payments, and witnesses' emergency contacts' information— none of which has any bearing on this case or witnesses' credibility. The government overreaches in this request. *See Reed*, 726 F.2d at 577 (trial court did not err in quashing subpoena where appellants did not request specific documents but rather sought entire investigation files without "any substantial foundation" for believing that those reports would furnish defensive matter). Similarly, in requesting "all records and communications regarding of retention of counsel for the

9

employee/former employee" (subpart 3), it appears the government seeks evidence to show that PG&E "selected" witnesses' attorneys.  West Decl. ¶ 2.  While the government might have alternative reasons for wanting to know if PG&E selected these witnesses' attorneys, it has not explained how this evidence is relevant at trial, i.e., how this fact undermines a witness's credibility or reflects consciousness of guilt.  Theoretically, an attorney selected by PG&E could steer the witnesses' testimony somehow in favor of PG&E, but concluding that the witness's testimony may be so swayed takes several logical leaps and is likely more prejudicial than probative.  The government has not provided any foundation for why PG&E's purported selection of the witnesses' attorneys would call into question the witnesses' testimony on the stand.  This is made all the more clear when contrasted with the other information the government seeks, i.e., documents reflecting that PG&E is paying for the witnesses' attorneys, which gives the witness a potentially personal reason for testifying in PG&E's favor.

The only information the government seeks that appears reasonably specific and based on anything more than plain speculation is the severance agreements and the retention agreements based on the government's proffer that (1) the severance agreements will show PG&E conditioned payments on the witness not saying anything adverse to PG&E, and (2) the retention agreements will show PG&E is paying for the witnesses' attorneys related to this case.  West Decl. ¶ 2.  The government's supporting declaration provides some support that the severance agreements and retention agreements actually have some likelihood of containing the information the government seeks—as opposed to the government's other requests, which are supported by no foundational information whatsoever.  *United States v. Johnson*, 2014 WL 6068089, at *6 (N.D. Cal. Nov. 13, 2014) ("Rule 17(c) does not 'allow a blind fishing expedition seeking unknown evidence.'" (quoting *Reed*, 726 F.2d at 576-77)).  Indeed, "[a] 'broad request' for documents 'based solely on the mere hope that some exculpatory material might turn up' does not justify enforcement of a Rule 17(c) subpoena." *Id.* (quoting *Cuthbertson*, 630 F.2d at 146).  Thus, while there is a sufficient likelihood the severance agreements and retention agreements will contain the information the government seeks, the question remains as to whether the government has met its burden of demonstrating that it should obtain this evidence before trial.

United States District Court
Northern District of California

As noted, the government's first evidentiary purpose for this evidence is to show bias of the witnesses. Bias is a form of impeachment evidence. *Horton v. Mayle*, 408 F.3d 570, 578 (9th Cir. 2005) (impeachment evidence includes materials showing bias or interest); *accord United States v. Shanahan*, 2008 WL 619213, at *3 (E.D. Mo. Mar. 3, 2008) ("The term 'impeachment' also refers to the bias or interest of a witness . . . . ." (citing *Berry v. Oswalt*, 143 F.3d 1127, 1132 (8th Cir. 1998)). Impeachment evidence is typically admissible, but in the context of Rule 17(c), "generally, the need for evidence to impeach witnesses is insufficient to require its production *in advance of trial*." *Nixon*, 418 U.S. at 701 (emphasis added). In the Ninth Circuit, where the defendant's *only* purpose for seeking the Rule 17(c) subpoena is to obtain impeachment materials, such a justification is insufficient to require pretrial production of such materials. *See Fields*, 663 F.2d at 881 (reversing district court's decision not to quash a subpoena where "[t]he only evidentiary use that defendants have been able to advance is that the statements and [records] could be used for impeachment purposes.").[4] However, "such materials might otherwise be subject to a Rule 17(c) subpoena where they have some 'other valid potential evidentiary uses[.]'" *Johnson*, 2014 WL 6068089, at *2 (quoting *Nixon*, 418 U.S. at 702).

The only other evidentiary purpose the government has posited is that these materials might be evidence of PG&E's "consciousness of guilt"—but the Court is unconvinced that such evidence is either relevant or admissible for such purposes. As to the severance agreements, the government has only asserted that these agreements are made on the condition that the former employee not say anything adverse "to PG&E." West Decl. ¶ 2. This condition is very general

---

[4] The government seeks to avoid *Fields* by citing out-of-Circuit case law for the proposition that, if "it is known with certainty that a particular witness will testify at trial, this rationale [for withholding impeachment evidence until trial] gives way because 'the statements properly may be considered evidentiary.'" Reply at 3 (quoting *United States v. King*, 194 F.R.D. 569, 574 (E.D. Va. 2000) ("It follows, therefore, that where it is known with certainty before trial that the witness will be called to testify, the admissibility determination, within the meaning of *Nixon*, can be made before trial, and the statements properly may be considered evidentiary." (citations omitted))). But the Court cannot properly adopt *King*. Indeed, in a footnote, *King* criticizes the Ninth Circuit's decision in *Fields* on the basis of the Ninth Circuit's reasoning and reading of Rule 17. *See King*, 194 F.R.D. at 585 n.5 (stating that *Fields*' "construction of Rule 17 . . . ignores [its] plain language" and "is at odds with the well-reasoned decisions which have made the issue a discretionary one depending upon the facts of particular cases and upon the certainty with which the court could say that the person giving the statement would testify at trial."). While the Eastern District of Virginia may freely reject the holdings of the Ninth Circuit, this Court may not.

11

United States District Court
Northern District of California

and broad and could serve a variety of valid purposes other than essentially asking witnesses to perjure themselves at trial.  In a sense, this goes back to the specificity of the government's request: the government has not indicated that the severance agreements were made on the condition that witnesses lie about what PG&E did *in relation to the circumstances of this case*.  If the government had made some showing that the severance agreements actually contained such information, then the Court would agree that such evidence would be relevant and likely admissible to show PG&E's consciousness of guilt.  *See United States v. Johnson*, 2015 WL 1967239, at *4-5 (N.D. Cal. Apr. 30, 2015) (Henderson, J.) (evidence of witness tampering is highly probative to consciousness of guilt).  But that is not what the Court has before it.  The government has only said that the severance agreements conditioned payments on the witness not saying anything adverse to PG&E—alone this evidence is improper to show that because PG&E does not generally want something adverse being said about it that it has a guilty mind about the alleged crimes in this case.  Indeed, the government does not even state when these severance agreements were signed—before, during, or after relevant events in this case.  The Court will not join the government on its logical leap that the severance agreements contain evidence of PG&E's guilty mind.  Similarly, the Court is concerned about the potential for the improper use of these materials as character evidence in violation of Federal Rule of Evidence 404(b)(1).

As to the retention agreements, it is not clear how the government intends to show that PG&E's payment of its current and former employees' attorneys demonstrates PG&E's consciousness of guilt.  Regardless of what PG&E was required to do under the California Labor Code, the evidence about PG&E's payment of its employees' attorneys is not probative evidence of PG&E's consciousness of guilt alone.  If the government provided some indication that PG&E had effectively tampered with those witnesses as a result of its payment of their attorneys, perhaps then the Court could see how the government might use those payments as evidence of consciousness of guilt.  *See Johnson*, 2015 WL 1967239, at *4-5.  But the government provided no such information, and in general, PG&E's payment of counsel for its employees appears to be routine practice in such cases.  *See Defending Corp. & Indiv. in Gov. Invest.* § 3:18 ("It is common for a company to retain a single law firm to represent all similarly-situated employees who are

merely witnesses, that is, are not believed to have any potential personal exposure, and whose interests do not otherwise conflict.  Doing so allows a single firm—often called 'witness counsel' or 'pool counsel'—to become familiar with the issues in the case and efficiently provide advice to a group of employees."); Richard Kiefer, Effective Pre-Prosecution Strategies to Prevent Indictment (Thomson Reuters 2012), 2014 WL 7335780, at *2 ("In many cases, corporations retain one attorney to represent all or a large number of corporate employees, including officers, as 'pool counsel.'").  At this point, the government has not articulated how this evidence might actually be used to show PG&E's consciousness of guilt.  Nonetheless, the Court agrees with the government that the fact of PG&E's payment of witnesses' attorneys might be relevant to the witnesses' bias as witnesses could feel they owe something to PG&E or fear financial exposure without PG&E's assistance.  Accordingly, the only proper evidentiary use articulated by the government goes to the witnesses' credibility.

Although there is no basis for allowing the government to obtain such impeachment evidence before trial in this Circuit, *Fields* suggests an alternative procedure where if "the other required factors were demonstrated to a sufficient extent," such circumstances might "warrant *in camera* production [of the impeachment materials] to the district court for possible release after the evidentiary requirement had been met[,]" i.e., after the witness testified.  663 F.2d at 881 (citing *Cuthbertson*, 630 F.2d at 144-45).  Consequently, "where a defendant has identified evidence that would be admissible for impeachment but not otherwise, several courts have ordered the items produced for *in camera* inspection so that the court may review the material and disclose it, if ever, when it becomes ripe for impeachment."  *Reyes*, 239 F.R.D. at 601 (citations omitted) ("Regardless of the wisdom or efficacy of *in camera* review, it is the only route available to Reyes.").  Accordingly, while the government may not obtain this impeachment evidence before trial, as it has otherwise met the other *Nixon* factors for the severance and retention agreements, this information may be properly submitted for *in camera* review.

The only remaining objection is that these agreements may contain private or privileged information.  Opp'n at 7-10.  Specifically, PG&E argues that the retention agreements are protected by the attorney-client and joint defense privileges, and that California's constitutional

13

right to privacy protects against the disclosure of "personnel records." *Id.* at 7, 10.  Counsel for the witnesses likewise argue the information is protected under California law, the attorney-client privilege, and as attorney work product.  First Objs. at 2-5.  While courts have recognized that a Rule 17(c) subpoena should be quashed or modified if it calls for privileged matter, *Reyes*, 239 F.R.D. at 598, it is not clear the severance or retention agreements qualify.  "The Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine." *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 599 (S.D. Cal. 2014) (collecting cases).[5]  The government also disputes whether state privacy laws can trump the federal subpoena power.  *See* Reply at 3 ("Under the Supremacy Clause, state privacy rules give way to the federal subpoena power." (citation omitted)).  The parties and witnesses' briefing on that issue is very limited, and in any event, it is not clear whether the witnesses claim any privacy interests in the retention and severance agreements specifically, as opposed to the more general personal records.  Consequently, the Court finds that PG&E should submit for *in camera* review the severance agreements and retention agreements of the witnesses listed above, save Glen Carter.  This *in camera* review will also give the Court an opportunity to consider whether these documents contain privileged information.

In sum, the Court will grant request A of the first Application but only for (1) the production of the severance agreements and retention agreements for the listed witnesses (except for Glen Carter) and (2) only for lodging these documents with the Court for its *in camera* review. This is without prejudice to any motion to quash by PG&E or another party with standing.

### b.  Second Application

Like request A of the first Application, the government's second Application seeks documents that will provide the government with information about certain witnesses' legal

---

[5] "Communications between attorney and client that concern the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege." *Paul v. Winco Holdings, Inc.*, 249 F.R.D. 643, 654 (D. Idaho Feb. 27, 2008) (quoting *Clarke v. Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992)).  However, "correspondence, bills, ledgers, statements, and time records which also reveal the motive of the client in seeking representation, litigation strategy, or the specific nature of the services provided, such as researching particular areas of law, fall within the privilege." *Id.*

United States District Court
Northern District of California

representation.  *See* Sec. Appl. Br. at 2.  Specifically, it seeks from the witnesses' attorneys (1) all non-privileged records and communications regarding retention for representation; and (2) all billing records, including nonprivileged time entries, relating to *United States v. Pacific Gas and Electric Company* (CR 14-00175) or any investigation by the U.S. Attorney's Office for the Northern District of California related to PG&E.  *Id.*  The government also requests the attorneys provide a privilege log if any responsive documents within the scope of this subpoena are withheld on privilege grounds.  *Id.*  Again, the government seeks this information as impeachment materials to demonstrate potential bias of PG&E employees and contractors, both current and former, who may be witnesses at trial.  *Id.* at 5 (citing Schenk Decl. ¶ 2).  It contends "the records will show that PG&E selected and is paying for the witnesses' attorneys."  Schenk Decl. ¶ 2.

Like the request above, the Court agrees that generally the government's interest in obtaining impeachment evidence showing that witnesses might be biased in favor of PG&E because it pays their legal fees is relevant and admissible evidence; however, the government has provided argument about how documents reflecting PG&E's *selection* of witnesses' attorneys is relevant or admissible.  Again, PG&E has not provided any clear argument or foundation for why the selection of witnesses' attorneys would make them biased or impeach their credibility.  Accordingly, any evidence that does not relate strictly to evidence of the witnesses' bias will not be considered relevant or admissible for purposes of this Order.

As to specificity, again the government's request for "all" records and communications regarding retention for representation and "all" billing records, including time entries, is too broad.  The government has not shown why there is a "sufficient likelihood" that the documents sought contain relevant and admissible evidence.  *Nixon*, 418 U.S. at 700.  First, the government has not articulated how the time entries related to this case or any other investigation of PG&E will show that PG&E selected and is paying for the witnesses' attorneys or what in those time entries would reveal the witnesses' bias.  This request strikes the Court as a plain fishing expedition.  Second, while certain of the billing records may show that PG&E is paying for the witnesses' legal fees, the government has not articulated why it believes *all* the billing records are likely to contain this information.  If the government seeks particular information about who paid the bills, then it

should ask for that particular information, rather than making such a sweeping request. Consequently, the Court will modify the subpoena to billing records reflecting payments *by PG&E* for witnesses' legal fees relating to *United States v. Pacific Gas and Electric Company* (CR 14-00175) or any investigation by the U.S. Attorney's Office for the Northern District of California related to PG&E.

Third, the government's request for the records and communications regarding retention for representation also fails *Nixon*'s specificity requirement.  Theoretically, the documents sought could relate to the attorney's representation of the witness in another case altogether, not to mention disclosing information not at all related to whether PG&E selected or is paying for the witness's attorney.  In any case, as discussed above, the government has not explained why it would be relevant that PG&E selected the witnesses' attorney, thus records or communications showing PG&E chose a particular attorney for a particular witness is irrelevant.  The only reasonably specific inquiry in this request would be for the same sort of retention agreements the government seeks in request A of the first Application, which are likely to reflect whether PG&E is paying for witnesses' attorneys.  Accordingly, the Court likewise modifies and limits this request to the retainer agreements.

Finally, as the information the government requests is solely impeachment evidence, again the Court will only order these documents be produced for *in camera* review.  *See Nixon*, 418 U.S. at 701; *Fields*, 663 F.2d at 881.

In sum, the Court will grant the government's second Application but limited as follows: (1) to billing records only which reflect payments by PG&E for witnesses' legal fees relating to *United States v. Pacific Gas and Electric Company* (CR 14-00175) or any investigation by the U.S. Attorney's Office for the Northern District of California related to PG&E; and (2) to the retainer agreements for representation of the witnesses relating to *United States v. Pacific Gas and Electric Company* (CR 14-00175) or any investigation by the U.S. Attorney's Office for the Northern District of California related to PG&E.  This is without prejudice to any motion to quash that the witnesses or another party with standing might file.

//

B.      **Request B (First Application): All Drafts of RMI-06**

As to request B of its first Application, the government seeks "all versions, draft and otherwise, of PG&E's Risk Management Instruction (RMI)-06." First Appl. at 2. It explains the records it requests relate to the obstruction count in the Superseding Indictment. *Id.* at 3. Specifically, the government asserts that "[b]ased on a document originally identified on PG&E's Exhibit List and then withdrawn when the government inquired why it had not been previously produced, PG&E[] appears to have improperly withheld certain versions of this document [RMI-06] in its response to a prior subpoena." *Id.* (citing West Decl. ¶ 3). According to the government, it inquired why PG&E had not produced that version earlier, and PG&E consequently deleted the document from its Exhibit List. West Decl. ¶ 3. In its Reply, the government insists RMI-06 "is central to the obstruction of justice count, as well as several Pipeline Safety Act counts." Reply at 4.

PG&E asserts that the government "incorrectly argues that its request stems from 'a version of the document that the government had never received' that was on the defendant's draft exhibit list and then removed from its final list." Opp'n at 12. It contends "[t]he government's assertion is speculative, inaccurate, and misleading" and explains that PG&E merely removed that document from its final exhibit list because the document "duplicated a document that appeared on the government's list. Additionally, due to an error, the Bates number initially referenced was for a different document (also previously produced)." *Id.* It otherwise contends the government already has all the versions of RMI-06. *Id.* at 11-12.

As an initial matter, the government makes little attempt to establish the relevancy, admissibility, and specificity of its requests, spending a mere paragraph on this request in its Reply. In any case, taking the *Nixon* factors out of order, the Court first has no reason to question the admissibility of this evidence. While the drafts are hearsay, they would in all likelihood be admissible as statements by a party opponent under Federal Rule of Evidence 801(d)(2). That said, the Court has reservations about the relevance and specificity of this request as currently articulated. While the Court agrees that information concerning RMI-06 is generally relevant to the obstruction and potentially some of the Pipeline Safety Act ("PSA") counts, the government's

17

request is very broad, with no time limitations and no clear indication of how the government ultimately intends to use these documents for trial purposes. "[A] Rule 17(c) subpoena is not intended to serve as a discovery tool, . . . or to allow a blind fishing expedition seeking unknown evidence . . . ." *MacKey*, 647 F.2d at 901 (citations omitted). In *MacKey*, for instance, the Ninth Circuit affirmed the district court's decision to allow the government to subpoena an antitrust defendant's diary and calendar "to establish that he did indeed meet with competitors and engage in discussions that the Sherman Act prohibits." *Id.* at 901. The court noted that "[b]ecause the government has not yet seen the documents, it would be unreasonable to expect a more detailed connection be provided between the contents of the documents and the ultimate facts at issue in the case[,]" but it was nonetheless known that the defendant used the diary and calendar to record business meetings and transactions that he conducted as an executive. *Id.*

Unlike *MacKey*, the government has not articulated what it believes additional draft versions of RMI-06 will reveal or how it intends to use that information as evidence at trial. The government already has various versions of RMI-06 that it contends support its obstruction claim, and it appears it already subpoenaed this same information from PG&E at an earlier point. While *MacKey* counsels courts not to be overly demanding of a requesting party, who of course does not somehow clairvoyantly know what the documents contain, it does not relieve the requesting party of its duty to at least articulate how it believes the evidence sought to be evidentiary and relevant. Conclusory arguments as to relevance are not well received. *See Eden*, 659 F.2d at 1381 (finding requesting party failed to meet burden under *Nixon* and noting he "failed to make any show of relevancy other than mere conclusory statements."); *Binh Tang Vo*, 78 F. Supp. 3d at 181 (rejecting issuance of Rule 17(c) subpoena where government's justification was merely that the materials sought would be evidence it "could potentially even use in [its] case-in-chief[;]" such a "vague justification . . . makes clear the subpoenas were a general 'fishing expedition' that attempts to use the rule as a discovery device." (quotation omitted)). At this point, the government's request appears to be fishing for unknown evidence, seeking more information about how PG&E developed and crafted its various drafts of RMI-06, but without a clear sense of how it intends to ultimately use that information at trial. *Cf. MacKey*, 647 F.2d at 901 (diary and

1    schedule could be used to show meetings with competitors).

2          Indeed, where a 17(c) subpoena request is "based on solely a mere hope" that some

3    relevant material might turn up, courts tend to deny such requests.  *See Cuthbertson*, 630 F.2d at

4    146 (finding district court should have quashed subpoena containing a "broad request for material

5    in CBS's possession on a very slight showing of the evidentiary nature of the material sought.");

6    *Binh Tang Vo*, 78 F. Supp. 3d at 181 ("[I]f the moving party cannot reasonably specify the

7    information contained or believed to be contained in the documents sought but merely hopes that

8    something useful will turn up, this is a sure sign that the subpoena is being misused." (quotation

9    omitted; alteration in original)).  Without more, the Court cannot find the government has

10   established the relevancy of this request.  This request is consequently denied without prejudice.

**C.     Request C: The "April 16, 2011" Letter**

12         In request C of the first Application, the government seeks an electronic version of the

13   April 6, 2011 letter, which it misidentified in the original subpoena as the "April 16, 2011" email.

14   First Appl. at 3; Reply at 4 n.5.  The government explains that PG&E only provided this letter to

15   the government in pdf format in October 2014, after the government had superseded the

16   indictment to add an obstruction of justice charge and had obtained another pdf copy from the

17   NTSB.  Reply at 4-5.  Now it seeks the electronic version of the letter, including metadata and

18   attachments.  First Appl. at 3.  Initially, the government explained this request seeks documents

19   and data it alleges PG&E improperly withheld from the government in response to a prior

20   subpoena and which the government asserts relates directly to the letter at the heart of the

21   obstruction count.  *Id.* (citing West Decl. ¶ 4).  In its Reply, the government further explains that

22   "[t]he purpose for the subpoena is to obtain the document in its original format, including

23   associated metadata showing—for example—who created, modified, saved, and printed the

24   document, and when, including any previous versions and comments to earlier versions."  Reply at

25   5.  It contends that "PG&E has kept the author and editors of this letter a mystery, and a copy of

26   the letter in its native format may reveal this information."  *Id.*  Finally, it argues that "PG&E does

27   not dispute the relevance of this very specific request, which the government has no other means

28   to pursue before trial, and PG&E has steadfastly refused to produce it thus far."  *Id.*  PG&E's only

19

1   argument is that the government already has copies of the letter.  Opp'n at 12.

2          Again, the government made no arguments under the *Nixon* factors as to how the

3   information it seeks is admissible, relevant, or specific.  Nonetheless, considering the *Nixon*

4   factors, the Court first finds the request is adequately specific.  Metadata, commonly described as

5   "data about data," is defined as "information describing the history, tracking, or management of an

6   electronic document."  *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 646 (D. Kan. 2005)

7   (quotation omitted).  "Examples of system metadata include data concerning 'the author, date and

8   time of creation, and the date a document was modified.'"  *Aguilar v. Immigration & Customs*

9   *Enf't Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 354 (S.D.N.Y. 2008) (quotation

10  omitted).  It can come from a variety of sources; "it can be created automatically by a computer,

11  supplied by a user, or inferred through a relationship to another document."  *Williams*, 230 F.R.D.

12  at 646-47.  The government's request for the electronic version of the email seeks information

13  showing who worked on the document and when.  There is a sufficient likelihood PG&E's

14  production of documents showing the metadata will reflect this information.

15         Although the government has not explained precisely how it intends to use this information

16  at trial, it is less of a leap than some of the government's other requests to see how this

17  information would be evidentiary.  It goes to show which PG&E employees worked on the letter

18  and were involved in the alleged obstruction of the NTSB investigation.  It will provide a "clearer

19  picture" of the circumstances surrounding the production and sending of this letter.  *See United*

20  *States v. Johnson*, 2014 WL 6068089, at *6 (N.D. Cal. Nov. 13, 2014) (permitting the subpoena of

21  police department investigatory files prior to an evidentiary motion to suppress hearing related to

22  allegedly unconstitutional search at issue because "the officers' reports, drafts, notes, and

23  memoranda would provide a clearer picture of what transpired during the search . . . , and are

24  therefore directly relevant as evidence . . . .").

25         As to admissibility, the Court foresees no problems with this evidence.  Such metadata is

26  unlikely to be considered hearsay.  *See United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110

27  (9th Cir. 2015) (holding that "[a] tack placed by the Google Earth program and automatically

28  labeled with GPS coordinates isn't hearsay" and joining other circuits in the rule that "machine

United States District Court
Northern District of California

United States District Court
Northern District of California

1    statements aren't hearsay"); *see also* The Sedona Conference Commentary on ESI Evidence &

2    Admissibility, 9 Sedona Conf. J. 217, 224 (Mar. 2008) ("System metadata does not constitute

3    'hearsay,' at least not under the Federal Rules of Evidence, because system metadata is generated

4    by a computer without human assistance.").  While there may be other evidentiary issues with

5    admitting this evidence such as authentication questions, among other things, there is nothing to

6    suggest the government is unable to overcome such threshold requirements.  Indeed, PG&E raised

7    no admissibility issues in its briefing on this request.

8          In light of the foregoing, the Court finds there is a "sufficient likelihood" that the

9    documents sought contain relevant and admissible evidence.  *Nixon*, 418 U.S. at 700.

10    Accordingly, the Court will grant the government's request.

11    **D.       Request D: Documents & Data in Web links**

12          Finally, in request D of the first Application, the government asks for the data referenced

13    in various web links in three specific emails.  First Appl. at 3.  It does not provide any additional

14    information about these emails other than the authors' and recipients' names, the date sent, and the

15    Bates numbers.  *Id.*  Nonetheless, the government contends the records sought in requests D.1 and

16    D.3 relate to the obstruction count, as they speak to PG&E's 10% cushion.  West Decl. ¶ 5.

17    Additionally, the government asserts that the records in request D.2 relate to incorrect and

18    incomplete pipeline specifications for Line 132, which it states are relevant to the PSA counts.  *Id.*

19    ¶ 6.  The government indicates these records will show discrepancies in PG&E's pipe

20    specification data regarding Line 132, as compared to the verified data after the San Bruno

21    explosion.  *Id.*  In their Reply, the government clarifies that "[t]he request is relevant because two

22    of these links reference PG&E's practice increasing operating pressure up to 110% of maximum

23    allowable operating pressure on pipelines containing manufacturing threats, and the third shows

24    discrepancies in PG&E's pipe specification data for the line that exploded in San Bruno."  Reply

25    at 5 (citing West Decl. ¶¶ 5, 6).  Finally, the government vaguely argues that this request "provides

26    context for statements by three trial witnesses, all of whom work or worked for PG&E[,]" which

27    "is necessary for the government's trial preparation" because it anticipates these witnesses will be

28    hostile and will not provide this context willingly.  *Id.*  It does not articulate which three witnesses

21

1    it is referring to in this argument, or which statements need context.

2         Without the emails or some further clarification from the government about what the

3    weblinks look like or how specifically the emails describe the content of those links (if at all), the

4    Court would be speculating about the relevance of this information.  The government's

5    explanation about the relevance of these links is very conclusory at this point, and as discussed

6    above, such conclusory proffers are not well taken in the context of Rule 17(c) subpoena requests.

7    Moreover, there is no information about the types of documents or data contained in those links

8    and whether any of that material might be admissible.  *See United States v. Cherry*, 876 F. Supp.

9    547, 553 (S.D.N.Y. 1995) (Rule 17(c) "may be used to obtain only evidentiary materials" and in

10   that sense, "can be contrasted with the civil rules which permit the issuance of subpoenas to seek

11   production of documents or other materials which, although not themselves admissible, could lead

12   to admissible evidence.").  "That is not to say that the materials thus subpoenaed must actually be

13   *used* in evidence.  It is only required that a good faith effort be made to obtain evidence."

14   *Bowman Dairy Co.*, 341 U.S. at 219-20 (emphasis added).

15        Again, while the information the government seeks might be potentially useful to it in

16   some way, it has not articulated how this information is actually relevant or evidentiary for use at

17   trial.  Rule 17(c) and Criminal Local Rule 17-2(a) require the Court to play a gatekeeping role to

18   ensure that neither criminal defendants nor the government misuse the subpoena power for

19   discovery.  *See Binh Tang Vo*, 78 F. Supp. 3d at 178-79 (collecting authorities holding that Rule

20   17(c)'s requirement of court approval before the issuance of a subpoena provides a "vital

21   protection against misuse or improvident use" of subpoenas because "[w]ithout the Court's

22   supervision, Rule 17(c) would lend itself to discovery of the broadest sort—a result that the

23   drafters of the Rule decried." (quotations omitted)).  The government has not met its burden under

24   the *Nixon* factors to show that this information should be produced; accordingly, the Court

25   exercises its gate-keeping function under Rule 17(c) to prevent the issuance of a subpoena with

26   request D.

27   //

28   //

United States District Court
Northern District of California

22

1

**CONCLUSION**

2   Based on the foregoing analysis, the Court **ORDERS** as follows:

3   (1) Request A of the first Application is modified to require (a) production of only the

4       severance agreements (also referred to as "separation agreements") and retention

5       agreements for the witnesses listed, save Glen Carter; and (b) PG&E lodge these

6       documents with the Court for *in camera* review **by April 12, 2016**.  Thus, this request

7       is **GRANTED IN PART** and **DENIED IN PART** without prejudice to a motion to

8       quash by PG&E or another party with standing.

9   (2) Request B of the first Application is **DENIED WITHOUT PREJUDICE**.

10  (3) Request C of the first Application is **GRANTED** without prejudice to a motion to

11      quash by PG&E or another party with standing.

12  (4) Request D of the first Application is **DENIED WITHOUT PREJUDICE**.

13  (5) Request A of the second Application is modified to require (a) production of only (i)

14      billing records only which reflect payments by PG&E for witnesses' legal fees relating

15      to *United States v. Pacific Gas and Electric Company* (CR 14-00175) or any

16      investigation by the U.S. Attorney's Office for the Northern District of California

17      related to PG&E; and (ii) the retainer agreements for representation of the witnesses

18      relating to *United States v. Pacific Gas and Electric Company* (CR 14-00175) or any

19      investigation by the U.S. Attorney's Office for the Northern District of California

20      related to PG&E; and (b) the responding parties lodge these documents with the Court

21      for *in camera* review **by April 12, 2016**.  Thus, this request is **GRANTED IN PART**

22      and **DENIED IN PART** without prejudice to a motion to quash by the witnesses or

23      another party with standing.

24  **IT IS SO ORDERED.**

25

26  Dated: March 28, 2016

27  _____

28  MARIA-ELENA JAMES
    United States Magistrate Judge

United States District Court
Northern District of California