Attachment

BRIAN J. STRETCH (CABN 163973)
United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

HALLIE MITCHELL HOFFMAN (CABN 210020)
HARTLEY M. K. WEST (CABN 191609)
JEFFREY B. SCHENK (CABN 234355)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7129
    Fax: (415) 436-7234
    hallie.hoffman@usdoj.gov
    hartley.west@usdoj.gov
    jeffrey.b.schenk@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 14-00175 TEH (MEJ) |
| Plaintiff, | DECLARATION OF HARTLEY M. K. WEST IN SUPPORT OF UNITED STATES' SUPPLEMENT TO *EX PARTE* MOTION FOR RULE 17 SUBPOENA |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant. | |

I, Hartley M. K. West, declare:

    1.    I am an Assistant United States Attorney in the Northern District of California and have been since January 2002. I am the Deputy Chief of the Economic Crimes and Securities Fraud Section, and I am assigned to the above-captioned case.

    2.    The government intends to prove that PG&E tied its employees' compensation directly to company performance, as well as individual performance, through Performance Incentive Plans (PIPs), Short Term Incentive Plans (STIPs), and Long Term Incentive Plans (LTIPs). PG&E emails make this connection explicit. Attached to this Declaration as Exhibit 1 are true and correct copies of several

PG&E emails showing this connection.

3. PG&E's offer letter to its former Director of Information Management Compliance, Leslie McNiece, also makes this connection explicit. Attached to this Declaration as Exhibit 2 is a true and correct copy of PG&E's offer letter to McNiece. The offer letter also shows that McNiece would be awarded stock, the value of which depends on company performance.

4. The performance appraisal of former Senior Vice President of Engineering and Operations, Ed Salas, clarifies that individual performance is assessed in part on meeting PG&E's expense and capital budgets and achieving company revenue targets. Attached to this Declaration as Exhibit 3 is a true and correct copy of an excerpted portion of Salas's performance appraisal.

5. Based on these records, the government has a specific, good faith basis for believing that employee offer letters, performance appraisals, incentive plans, and compensation (including stock and stock options) will demonstrate a nexus between employees' compensation and PG&E's financial performance, including the employees' role in meeting PG&E budgets and revenue targets.

6. This evidence is relevant to show, first, an employee's incentive to lower PG&E expenditures. The indictment alleges that PG&E willfully violated pipeline safety regulations, and the government's theory is that PG&E prioritized profits over safety. The government intends to argue that PG&E repeatedly deferred safety (integrity management) improvements to preserve company revenues (and with it, executive bonuses). That PG&E employees are incentivized to cut expenditures supports this argument. Second, the evidence is relevant to show that PG&E current and former employees have a financial incentive to testify favorably to PG&E because they own company stock. If PG&E is convicted of crimes based on this trial, it is reasonable to expect that PG&E stock will decline. Additionally, such evidence is admissible nonhearsay because the documents sought are statements of a party opponent (PG&E). Accordingly, this is not a fishing expedition.

7. Moreover, because a company acts through its employees, the government needs to call numerous PG&E employees (current and former) in its case-in-chief. It intends to elicit from these employees testimony about their actions and communications regarding the pipeline safety regulations, such as their records maintenance, pipeline safety threat assessments, and assessment prioritization practices. As it will be questioning these witnesses on direct, not cross-examination, it is important for

the government to show the employees' financial bias on direct examination as well. Thus, this case differs from those where impeachment evidence is unnecessary until cross-examination. Here, the vast majority of the government's witnesses are the defendant's employees, with a financial incentive favoring the defendant. Indeed, PG&E has not included a single employee on its Witness List, so the government expects that its impeachment of PG&E employees will occur in the government's case-in-chief, on direct examination. For this reason, the government requests that the personnel records sought in this Supplement – as well as the separation agreements and attorney retention agreements for which the Court has already ordered production in camera – be provided before trial.

8. The first weblink the government seeks is embedded in Government Exhibit 565. A true and correct copy of Government Exhibit 565 is attached to this Declaration as Exhibit 4. The Subject Line of this email is "MOP +10% Allowance for Manufacturing Seam Threat." In the email, written four months before the San Bruno explosion, PG&E Risk Management employee Calvin Lui asks his supervisor to review an embedded document so they could discuss, "since it seems to be a big issue with the audit looming." The embedded document is titled: <\\walnutcrk01\Mapping\RiskMgmt\Documentation\Weld Const Material Threats\MOPSeamIssues\_Documents\MOP 10% Allowance.doc>.

9. This document is highly relevant to numerous counts. The pipeline safety regulations required PG&E to assess activated manufacturing threats, and to prioritize such assessments. The regulations further provided that manufacturing threats were activated when a pipe's maximum operating pressure (MOP) was exceeded. PG&E is charged with willfully failing to comply with these regulations. The government intends to prove PG&E's willful noncompliance in part through its practice of considering manufacturing threats activated only if maximum operating pressure was exceeded *by more than 10%* (its "10% allowance"). Because this document deals specifically with the MOP 10% allowance, there is every reason to believe contains relevant evidence of PG&E's 10% practice, and thus direct evidence of its willful violations. Indeed, this email was sent just before PG&E was to be audited. PG&E had been paying particular attention to its 10% practice in anticipation of the audit, and Lui (the email's author) had been instructed to write a "white paper" that was supposed to justify the company's 10% practice.

10. Moreover, Count One charges PG&E with obstructing the NTSB investigation following the San Bruno explosion. Specifically, PG&E sent the NTSB (and its auditor, the CPUC) a letter dated April 6, 2011, in which it suggested that PG&E did not have, and never had, a 10% allowance. The embedded document titled, in part, "MOP 10% Allowance" is direct evidence that the April 6, 2011, was false and/or misleading.

11. The weblinks in Lui's March 31, 2011 email (Gov. Exh. 790) are relevant for similar reasons. A true and correct copy of Government Exhibit 790 is attached to this Declaration as Exhibit 5. In Exhibit 790, Lui advises his supervisor that he found two presentations – which are contained in the weblinks the government seeks through this Rule 17 subpoena – and that "[n]one discuss 10%." The date of Lui's email is significant – it is six days before PG&E sends the obstructive letter to the NTSB. PG&E appears to be preparing to deny its 10% allowance practice existed, and is checking for evidence to the contrary. The government has a good faith basis to believe that these presentations are relevant. Moreover, they are admissible nonhearsay as admissions of a party opponent.

12. Finally, the government seeks the folder located at L:\ENG\ILI_Team_(Frank_Dauby)\Peninsula Pipeline Records\L-132\L-132 PFL\L132FINALDOCS, as identified in an October 14, 2011 email to Frank Dauby (Gov. Exh. 634). A true and correct copy of Government Exhibit 634 is attached to this Declaration as Exhibit 6. As the email explains, this file contains two spreadsheets, the work of "the L132 team." The first spreadsheet "identifies all the discrepancies idenitified [sic]," and "is as accurate as we could make it."

13. This spreadsheet is important evidence of PG&E's willful record-keeping violations. After Line 132 exploded, PG&E was confronted with the errors in its records database regarding pipeline characteristics. Correct information about such characteristics is critical to an operator's ability accurately assess threats to a pipe's integrity. The "L132 team" undertook to determine all of the discrepancies between the pipeline characteristics reflected in its records database and its true characteristics. This chart appears to identify all of those discrepancies. These discrepancies will prove that PG&E did not maintain and integrate its data in compliance with the law. Further, the email and chart together show that, once PG&E bothered to dedicate the resources, it took only a few months to verify the line's pipe characteristics as the regulations require. Such evidence is therefore relevant and,

as a statement of a party opponent, admissible nonhearsay.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 31, 2016, at San Francisco, California.

_____
HARTLEY M. K. WEST